1 | Robert B. Carey (011186)
2 | Leonard W. Aragon (020977)
| HAGENS BERMAN SOBOL SHAPIRO LLP
3 | 11 West Jefferson Street, Suite 1000
| Phoenix, Arizona 85003
4 | Telephone: (602) 840-5900
| rob@hbsslaw.com
5 | leonard@hbsslaw.com

6 | [Additional Counsel Listed on Signature Page]

7 | Attorneys for Plaintiff

8

9

10

11 | **UNITED STATES DISTRICT COURT**

12 | **DISTRICT OF ARIZONA**

13 | Jeremy Wenokur, on behalf of himself and | No.
14 | all others similarly situated,

15 |              Plaintiff, | **CLASS ACTION COMPLAINT**
| **AND JURY DEMAND**
16 |        v.

17 | AXA Equitable Life Insurance Company,

18 |              Defendant.

19

20

21

22

23

24

25

26

27

28

Plaintiff Jeremy Wenokur ("Wenokur"), on behalf of himself and all others similarly situated, for his Complaint against defendant AXA Equitable Life Insurance Company ("AXA"), states as follows:

## I.    NATURE OF THE ACTION

1.    This is a class action brought on behalf of Plaintiff, Jeremey Wenokur, and similarly situated owners of Athena Universal Life II insurance policies issued by AXA.

2.    Plaintiff seeks to represent a class of AXA Athena Universal Life II policyholders who are subject to an unlawful, excessive, and inequitable cost of insurance ("COI") increase by AXA. AXA's COI increase violates the plain terms of Plaintiff's and all putative class members' Athena Universal Life II ("AUL II") insurance policies.

3.    The AUL II policies at issue here are all policies in an AXA product line called Athena Universal Life II, and all feature flexible-premium, universal life ("UL") policies. The key features of UL policies are that they allow policyholders to pay the minimum amount of premiums necessary to keep the policies in force. This feature differs from other kinds of whole life insurance policies that require fixed monthly premium payments. In contrast, owners of UL policies need only pay an amount sufficient to cover the COI charges and certain other specified expenses. This allows UL policyholders to minimize their capital investment in the policies and to generate greater rates of return through investments *other than* the UL insurance product. Any optional premium amounts a policyholder pays (in excess of COI charges and expense components) are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest.

4.    AXA expressly markets the AUL II policies to policyholders by utilizing "fact cards" touting the features that policyholders are able to "design premium payments according to your budget" and can "choose the amount and frequency of your premium payments." Indeed, the first page of the AXA policy contains a boldface title calling the policy a "Flexible Premium Universal Life Insurance Policy" and describes the policy as

a "flexible premium universal life insurance policy," where the policyholder can, within limits, "make premium payments at any time and in any amount."

5.     Although AXA markets the UL policy products specifically to policyholders seeking to minimize their premium payments and keep policy account values as low as possible, AXA has wrongfully sought to punish policyholders who have exercised their option to do just that. For AXA imposed drastic COI rate increases on certain AUL II policyholders, improperly targeting a subset of policyholders who exercise their contractual rights to keep their accumulated policy account values as low as possible and pay flexible premiums.

6.     AXA improperly targeted COI rate increases to a subset of universal life policies that it selected in part for their pattern of minimizing premium payments (and keeping policy values as low as possible) – even though the policies expressly permit that premium pattern, and were explicitly marketed to policyholders on the basis that the policies allowed for minimal premium payments and low policy account values.

7.     AXA has admitted that the COI increases for AUL II policies are targeted at only a subset of policies in the same policy class at issuance. Policies in the subset targeted for the drastic COI increase have two main features in common: the policies have issue ages over age 70, and current face values of over $1 million.

8.     The COI increases AXA imposed are exorbitant, and reflect a range of increases from approximately 27% to 70% over prior COI charges.[1]

9.     Through its exorbitant and improper COI rate increases, AXA seeks to force the hand of Plaintiff, and other similarly situated AXA policyholders, to take one of two unsavory courses of action. Policyholders in the improperly targeted subset of AUL II policies must either (a) pay exorbitant premiums that AXA knows would no longer

---

[1] Industry sources report that for policies with a face value of $1 million and an issue age of 70-70, the COI increased by 27%, while for policies with a face value of $1 million and an issue age of 80 and up the COI increase was 68%.

1    justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the

2    premiums policyholders have previously paid.

3         10.    Under either scenario, AXA stands to reap huge profits—either through

4    higher premium payments or by eliminating policies (through lapses or surrenders), all

5    while keeping the premiums that have been paid to date. In its SEC Form 10-Q for the

6    period ended September 30, 2015, AXA stated that the COI increase would be larger than

7    the increase it previously had anticipated, resulting in a $46 million increase to its net

8    earnings – a figure that is in addition to the profits that management had initially assumed

9    for the COI increase.

10        11.    AXA's conduct is not permitted by the policies at issue and is both

11   unlawful and inequitable.

12        12.    While the policies permit AXA to adjust the cost of insurance rates

13   periodically, AXA may do so only based on certain, enumerated factors, such as changes

14   to reasonable assumptions about mortality and investment experience. "Minimal funding"

15   of policies is not one of those enumerated factors.

16        13.    Publicly, and as mere pretext, AXA stated that the COI increase is

17   warranted because the affected insureds are dying sooner than AXA anticipated, and its

18   investment experience has been less favorable than expected.

19        14.    However, AXA's pretextual explanation is belied by the facts. Evidence

20   shows that mortality trends for the affected insureds have *improved substantially* since

21   the time the policies issued, and investment experience does not depend on the premium

22   payment patterns of any particular policyholder or subset of policyholders, but rather

23   relates to the performance of AXA's overall investments.

24        15.    AXA's pretextual explanation also is contradicted by its prior admissions.

25   AXA, like other insurance companies, was required to file answers to interrogatories and

26   give actuarial opinions every year as to whether any of their anticipated policy experience

27   has changed. Notably, in AXA's 2014 filing, dated February 25, 2015, AXA replied "no"

28   to the interrogatory asking whether its "anticipated experience factors underlying any

3

nonguaranteed elements [are] different from current experience." Given its "no" response—a mere seven months before its massive COI rate increase was announced—AXA cannot credibly justify the enormous rate increase on the grounds that it was "based on" a change to anticipated experience.

16.    Also, by targeting only a subset of a risk class of AUL II policyholders, AXA further violated the terms of the policies.  The AUL II policies at issue here require that any change in COI rates "will be on a basis that is equitable to all policyholders of a given class." Yet, AXA has admitted that its exorbitant COI increases are directed at only a certain subset of policies of the same class at issuance (those with issue ages above 70 and a current face value above $1 million). Because there is no equitable basis to single out that subset of policyholders for an increase, the increase is impermissibly inequitable.

17.    As publicly reported, the AXA COI increases range from 27% to 68% as compared to some prior COI charges. Such massive COI increases are not warranted under the enumerated policy factors, violate the terms of the policies, and are unlawful and inequitable.

18.    Upon information and belief, this is not the first time that AXA has improperly, and in violation of the policy terms, increased COI charges for Plaintiff and Class members.

## II.    THE PARTIES

19.    Plaintiff, Jeremy Wenokur, a resident of Utah, is the owner of an AUL II life insurance policy (number 156213337), insuring the life of John Doe.[2] The Doe policy was issued by AXA in Arizona, on or about July 5, 2006, and currently has a face value of $5 million (the "Doe Policy"). At issuance, John Doe was age 75. The Doe Policy remains in-force with AXA. The Doe Policy is subject to AXA's COI increase that was announced in October 2015, and that was reflected in the first monthly deduction processed on or after March 8, 2016.

---

[2] For privacy reasons, Plaintiff has substituted "John Doe" for the name of the actual insured.

20.     Defendant AXA is a corporation organized and existing under the laws of New York, having its corporate headquarters in New York, New York. The policy lists AXA's home office at 1290 Avenue of the Americas, New York, New York.

### III.     JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) in that this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

22.     This Court has personal jurisdiction over Defendant because it has conducted, and continues to conduct, business in the District of Arizona, and because Defendant committed the acts and omission complained of herein in the District, including issuing the policy giving rise to the complaint in the District of Arizona. Defendant has conducted business in the State of Arizona since March 7, 1899, and is a licensed Life & Disability Insurer by the Arizona Department of Insurance. Upon information and belief, Defendant has collected billions in premiums in the state of Arizona, including collecting over $162 million in premiums just in 2015 alone, the last year for which data was reported.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to Plaintiff's causes of action occurred in this District, including AXA's COI rate overcharge.

### IV.     FACTUAL BACKGROUND

A.     **The Policies**

24.     The policies at issue are all individual, flexible-premium, universal life policies, marketed under the product name Athena Universal Life II policies, and issued by AXA from 2004 to 2007. Hallmarks of the policies at issue are that there are no fixed or minimum premium payments specified in the policies.

25.     Such flexible-premium policies are preferred by some policy owners specifically because they allow the owners to pay the bare minimum required to keep the policy in force (i.e., the policy owners can keep the policies' Policy Account Value as low as possible) while preserving capital for other investments that may yield higher returns than the interest to be credited on the Policy Account. It is up to policyholders to decide whether to keep their Policy Account Value as close to zero as possible (by paying only the bare minimum to cover COI and the other administrative expenses needed to keep the policy in effect), or to pay more of the premium in order to build the cash amount subject to interest payments in their Policy Account. By contrast, in the case of fixed-premium policies, the insurer has the use of the premiums in excess of the COI charge and can profit on its own investment of those excess premiums.

26.     AXA has explicitly promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments."

27.     As one would expect, the amount of the COI charge is highly material to universal life policyholders for two key reasons: (1) the COI charge is typically the highest expense that a policyholder pays; and (2) the COI charge is deducted from the Policy Account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to AXA (this is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the Policy Account and credited with interest by AXA).

28.     All AXA policies in the AUL II product line contain the same common language about how the COI rates will be determined:

> We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision.

29.     In turn, the "Changes in Policy Cost Factors" provision states:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) **will be on a basis**

> *that is equitable to all policyholders of a given class*, and will be determined *based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse*. . . . Any change in policy cost factors will be determined in accordance with *procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered*.

(emphasis added).

30.    The policies at issue are all contracts of adhesion: they are form policies, and insureds are not permitted to negotiate different terms.

**B.    AXA Imposes Unlawful COI Increases**

31.    On or about October 1, 2015, AXA announced that, effective with the first monthly deductions occurring in 2016, it would increase the COI rates for AUL II policies with issue ages of 70 or older and with current face amounts of $1 million and higher. AXA notified Plaintiff of the future increase by letter dated October 5, 2015.

32.    In a slight change of course, in December 2015, AXA announced that it would defer the effective date for the COI increase until the first monthly deduction processed on or after March 8, 2016.[3]

33.    AXA has provided no justification for the COI increase other than to claim it is based solely on two factors: allegedly less favorable "future mortality and investment experience" over the past few years. The Wall Street Journal quoted an AXA spokesperson explaining the reason for the increase as: "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold."

34.    Similarly, AXA's SEC Form 10-Q, for the period ended September 30, 2015, stated, "the Company is raising the COI rates for these policies as management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established." And, AXA has

---

[3] The purported reason for the delay was to enable more policyholders to obtain illustrations reflecting the new COI increase.

distributed a FAQ on the "Athena Universal Life II COI Rate Change," in which the increase is explained as follows: "We expect future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established and because our view of the anticipated experience has changed, this has necessitated a change in COI rates."

**C.     The COI Increases Violate the Policy**

35.     The COI increases breach the policy in at least three ways: (1) they are not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse"; (2) they are not "equitable to all policyholders of a given class"; and (3) they are not "in accordance with procedures and standards on file" with the relevant insurance officials.

**1.     AXA's Increase Is Not Permitted by the Enumerated Factors**

36.     The policies at issue list the only six "reasonable assumptions" that may trigger a COI rate change under the terms of the policy. The six factors a permitted COI may be "based on" are "expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Any COI rate adjustments must be 'based on' the enumerated factors, and only those factors.

37.     AXA publicly stated that the 2016 increase was based on only two factors, which are investment experience and mortality. However, neither of those factors credibly warrants the increases.

**2.     Mortality Has Improved**

38.     Contrary to AXA's claims that the increase is warranted in part because it found that "policyholders were dying sooner" than it expected, mortality rates have actually improved steadily each year – i.e., mortality risks have only gotten better over time, as people are living much longer than anticipated when the products were priced and issued.

39.     The policies at issue specifically utilized the "1980 Commissioners Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables" (for

8

attained ages 18 and over) ("1980 CSO") as the basis for establishing maximum insurance costs.[4]

40. In the intervening years, there have been multiple studies and updates to mortality tables relied upon by the insurance industry.

41. For example, the 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries ("SOA") (which performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables). Periodically the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table ("VBT")
- 2015 Valuation Basic Table

42. The 2001, 2008 and 2015 Valuation Basic tables each show **_significant mortality improvements_** from the 1990-1995 Basic tables, demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently, and that trend continues. AXA itself recognized that in 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

43. For older aged insureds—like those impacted by the extreme COI increase—the trend of improving mortality is even more pronounced. In particular, the 2008 VBT showed an improvement for older age mortality as compared to prior tables

---

[4] These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. A mortality table is a chart showing the rate of death at a certain age.

used at the time the AUL II policies were priced. More importantly, the trend in improving mortality for older ages continued with the introduction of the 2014 VBT.

44.     In the face of improving mortality experience, as reflected in the updated tables, there is simply no negative mortality experience to justify an increase in the COI, let alone the steep increases AXA imposed. Indeed, through early 2015, AXA continued to inform regulators that it had not in fact observed a negative change in its mortality experience, wholly undercutting its pretextual basis for the increase.

**3.      Investment Income Cannot Warrant the Increase**

45.     AXA also claims that the increase was based on a change to its expectations of future "investment experience." Specifically, that its "investments were earning less than forecast when the policies were sold." Although "investment experience" is not a listed factor that may be considered for increasing COI rates, "investment income" is a listed factor.

46.     AXA aggregates its capital to make investments into various financial instruments and assets, such as bonds and securities. These investments earn "income" that changes depending on how well the assets are performing. Whether investment income rises or falls, the performance of those investments is entirely unrelated to the funding decisions or premium payment patterns of an individual policyholder or even a subset of policyholders. Therefore, even if AXA's investment income has changed, this factor cannot justify inflicting a COI increase solely ***on the subset of AUL II policies*** upon which AXA has sought to impose the COI increase (those with higher issue-ages and face-amounts).

47.     Moreover, in order to impose a COI increase due to a change in reasonable investment income assumptions, the increase should, in some way, actually correspond to observed changes in investment income. However, since approximately 2004, in its public reports, there has been no discernable change in the pattern of AXA's investment income, and no correlation between "investment income" and premiums received, that would in any way justify the exorbitant COI increase in 2016.

1    **4.    Minimal Funding is Not An Enumerated Factor**

2      48.    Make no mistake, regardless of the pretexts offered by AXA, there is no

3  dispute that the COI increase specifically targets policyholders who exercised their

4  contractually permissible right to minimally fund their policies. But funding patterns, or

5  Policy Account Value, are not enumerated factors that AXA may consider in adjusting its

6  COI rates. Further, even if AXA were somehow permitted to consider funding patterns in

7  increasing COI rates, it could not have had any change in its "reasonable assumptions" as

8  to how these policies would be funded. They were marketed as flexible-premium

9  policies; at issuance, AXA knew these policies would attract owners, such as life

10 settlement investors, who typically minimally fund the policies.

11     **5.    AXA'S Increase is Not Equitable**

12     49.    The policy mandates that "Changes in policy cost factors (interest rates we

13 credit, cost of insurance deductions and expense charges) will be on a basis that is

14 equitable to all policyholders of a given class." As a result, a policy change may not

15 unfairly discriminate against certain policyholders within the same class.

16     50.    Here, AXA's COI increase is not "equitable to all policyholders of a given

17 class" because it impermissibly singles out and discriminates against a subset of

18 policyholders within a larger risk class.

19     51.    First, the AXA increase specifically and unfairly targets policyholders who

20 exercised their contractually permissible right to minimally fund their policies. AXA

21 increased the COI rate only on a group of policyholders that were selected in part for

22 their pattern of premium payments; specifically, the increases target owners who

23 minimize their premium payments and keep policy values as low as possible. Although

24 AXA states that it is imposing an increase on the affected block because "investment

25 experience" is less favorable than it anticipated, it appears the real reason that the

26 affected group of policyholders was selected for the increase is because of their (entirely

27 permissible) low funding patterns.

28

52.    But it is not equitable to impose an increase on policyholders based on their funding patterns. The policies are expressly marketed and designed as flexible-premium policies that permit policyholders to select whatever funding pattern they choose, provided only that they pay enough to keep the policies in force. It is simply inequitable for AXA to punish policyholders merely for exercising these fundamental contractual rights. More importantly, the policies, which enumerate the only permissible factors to consider in increasing COI rates, do not mention minimal funding or premium payment patterns as permissible factors to consider when increasing the COI.

53.    Second, there is no actuarial justification for increasing the COI rates on the selected group of policies – those with issue ages 70 and above and current face value amount of $1 million and above. The policy does not permit AXA to use issue-age or face value to determine who gets a COI increase. Rather, of the limited permissible factors, AXA only claims that mortality and investment income are relevant to its decision to increase COI rates. But AXA cannot reasonably expect that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value. Nor is it plausible that AXA's reasonable assumptions about future mortality and investment income experience would differ between these two policies. Because insurance companies do not make investment decisions on a policy-by-policy basis, rather, they pool money for investments, the performance of those investments does not depend in any way on the premium payment patterns of any particular policyholder or subset of policyholders. In other words, issue-age and face-amount, the criteria that AXA used for determining the subset of policies to saddle with an enormous COI increase, do not coincide with any actuarially acceptable reasons for imposing a COI increase on the selected policies. As a result, the increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant policy class.

54.    Finally, AXA has not increased COI rates across the board for other UL policies. Indeed, in its FAQ on the AUL II increase, AXA states that "at this time, we

have no plans to raise COIs on any other products, including products we are currently selling." Had AXA actually experienced deviations from its expectations of future mortality or investment income, its COI rates would have increased for a broad range of life insurance policies. That it did not implement any such broad increase confirms that the COI increases are being used to unfairly target certain policies and policyholders in an inequitable manner, and premised on improper factors not provided for in the policy.

## V.    CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action individually, and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to herein as the "AXA COI Increase Class"—consists of:

> All owners of Athena Universal Life II issued by AXA Equitable Life Insurance Company that were subjected to a cost of insurance rate increase announced by AXA on or about October 1, 2015 (excluding defendant AXA, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

56.    The AXA COI Increase Class consists of hundreds of consumers of life insurance, and is thus so numerous that joinder of all members is impracticable. The identities, and addresses, of class members can be ascertained readily from business records maintained by AXA.

57.    The claims asserted by Plaintiff are typical of the claims of the AXA COI Increase Class.

58.    Plaintiff will fairly and adequately protect the interests of the AXA COI Increase Class and does not have any interests antagonistic to those of the other members of this class.

59.    Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

60.    This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the

classes predominate over those questions affecting only individual members. Those common questions include:

    (a)   the construction and interpretation of the form insurance policies at issue in this litigation;

    (b)   whether AXA's actions to increase the cost of insurance charges on the AUL II policies violated the terms of those form policies;

    (c)   whether AXA breached its contracts with the class members; and

    (d)   whether Plaintiff and Class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages.

61.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (a)   due to the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

    (b)   when AXA's liability has been adjudicated, claims of all class members can be determined by the Court;

    (c)   this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

    (d)   without a class action, many class members would continue to suffer injury, and AXA's violations of law will continue without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

    (e)   this action does not present any undue difficulties that would impede its management by the Court as a class action.

# VI.    CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (ON BEHALF OF PLAINTIFF AND THE AXA COI INCREASE CLASS)

62.    Plaintiff re-alleges and incorporates herein the allegations of paragraphs 1 through 61 of this complaint as if fully set forth herein.

63.    The subject policies are binding and enforceable contracts.

64.    AXA's rate increase has materially breached the Policies in several respects, including but not limited to the following:

(a)    AXA breached the policies by increasing COI rates based on a policy's issue age and face value even though those factors are not included in the permissible and enumerated bases for increasing cost of insurance rates;

(b)    AXA breached the policies by increasing the COI rates on bases that do not apply equitably to the class of insureds;

(c)    AXA breached the policies because AXA's COI rate increase was not based on the permissible factors stated in the policies, such as AXA's expectations of future mortality; and

(d)    AXA breached the policies because AXA's COI rate increase was not determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered.

65.    Plaintiff has performed all of his obligations under the policies, except to the extent that his obligations have been excused by AXA's conduct as set forth herein.

66.    Each of the policies also includes an implied covenant that AXA will act in good faith and deal fairly, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. AXA breached the implied covenant of good faith and fair dealing by undermining Plaintiff's right to pay premiums as needed to cover monthly deductions. By increasing

the cost of insurance rates in the manner in which it did, AXA is, among other things, penalizing and deterring policyholders from exercising their contractual right to maintain a minimal policy value, which AXA has no right to do.

67. As a direct and proximate cause of AXA's material breaches of the policies, Plaintiff and the COI Increase Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

(a) Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Appointing Plaintiff as the Class Representative and his attorneys as Class Counsel;

(c) Awarding Plaintiff and the Class damages pursuant to the First Cause of Action;

(d) Awarding Plaintiff and the Class pre-judgment and post-judgment interest pursuant to their First Cause of Action, as well as costs; and

(e) Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

RESPECTFULLY SUBMITTED this 18th day of January, 2017.

HAGENS BERMAN SOBOL SHAPIRO LLP

By: s/ Leonard W. Aragon
Robert B. Carey (011186)
Leonard W. Aragon (020977)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Scott A. Kamber (*Pro Hac Vice forthcoming*)
KAMBERLAW LLC
142 West 57th Street
New York, New York 10019
Telephone: (212) 920-3072
skamber@kamberlaw.com

Deborah Kravitz (*Pro Hac Vice forthcoming*)
KAMBERLAW LLP
401 Center Street, Suite 111
Healdsburg, California 95448
Telephone: (707) 820-4247
dkravitz@kamberlaw.com

Attorneys for Plaintiff

17